No. 2014-1221

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

ASTRAZENECA AB, AKA ASTRA ZENICA AB, AKTIEBOLAGET HÄSSLE,
KBI-E INC., KBI INC., and ASTRAZENECA LP,

*Plaintiffs-Appellees*,

v.

APOTEX CORP., APOTEX, INC., and TORPHARM, INC.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Southern District of New York
in Case No. 01-CV-9351, Hon. Denise L. Cote

_____

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFFS-APPELLEES
## ASTRAZENECA AB, AKTIEBOLAGET HÄSSLE,
## KBI-E INC., KBI INC., AND ASTRAZENECA LP

_____

Constantine L. Trela, Jr.
John W. Treece
David C. Giardina
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
(312) 853-7000

Paul J. Zegger
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Joshua E. Anderson
SIDLEY AUSTIN LLP
555 W. 5th St., Ste. 4000
Los Angeles, CA 90013
(213) 896-6000

*Counsel for Plaintiffs-Appellees AstraZeneca AB, Aktiebolaget Hässle,
KBI-E Inc., KBI Inc., and AstraZeneca LP*

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees AstraZeneca AB, Aktiebolaget Hässle, KBI-E Inc., KBI Inc., and AstraZeneca LP certifies the following:

1.    The full name of every party or *amicus curiae* represented by me is:

AstraZeneca AB, Aktiebolaget Hässle, KBI-E Inc., KBI Inc., and AstraZeneca LP.

2.    The name of the real party in interest (if the parties named in the caption are not the real parties in interest) represented by me is:

Same as stated in paragraph 1.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

The parent corporation or publicly held company holding 10% or more of the stock of AstraZeneca AB, Aktiebolaget Hässle or AstraZeneca LP is AstraZeneca PLC, and the parent corporation or publicly held company holding 10% or more of the stock of KBI-E Inc. and KBI Inc. is Merck & Co., Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or *amicus curiae* now represented by me in the trial court or agency or are expected to appear in this Court are:

**Sidley Austin LLP**
Constantine L. Trela, Jr.; John W. Treece; Joshua E. Anderson; Alycia A. Degen; David C. Giardina; Courtney A. Rosen; Paul J. Zegger; Zachary A. Madonia; Brent L. Nichols; Angelo J. Suozzi

**Milbank, Tweed, Hadley & McCloy LLP**
John M. Griem, Jr.; Errol B. Taylor; Frederick M. Zullow; Lawrence T. Kass; Robert J. Koch; Jay I. Alexander; Chris L. Holm; Claire A. Gilmartin; Marc A. McKithen; Medina Senghore; Enrique D. Longton; Kiera A. Mathey; Kerry McIlroy; Jason Gonder; David C. Haber; Emily J. Kunz; Jennifer O. Scism; Erin O. Buell; Dana R. Weir

**Robinson, Curley & Clayton, P.C.**
Alan F. Curley; Robert L. Margolis

**Fitzpatrick, Cella, Harper & Scinto**
Robert L. Baechtold; Charles P. Baker; Gergory B. Sephton; John D. Carlin;
Simon D. Roberts; Tara A. Byrne; Joshua Rothman; David M. Conca; Ha Kung
Wong; Lori A. Wolfe; Rachel A. Repka; P. Jason Hadley; Edward J. Callaghan;
Rekha Ramani


DATE:    May 8, 2014

                                    /s/ Constantine L. Trela, Jr.
                                   Constantine L. Trela, Jr.

                                   *Counsel for Plaintiffs-Appellees*
                                   *AstraZeneca AB, Aktiebolaget Hässle,*
                                   *KBI-E Inc., KBI Inc., and AstraZeneca LP*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF RELATED CASES .................................................ix

INTRODUCTION .................................................................................1

STATEMENT OF ISSUES ...................................................................5

STATEMENT OF THE CASE................................................................5

I.    Procedural Background. .................................................................5

II.    Statement Of Facts.........................................................................6

      A.    The PPI Market Before the Hypothetical Negotiation.........................6

            1.    Astra's Development of Omeprazole and the Patents. ..............6

            2.    Prilosec®, Nexium®, and the Other PPIs. .................................7

            3.    Astra's Litigation Against Generic Manufacturers....................8

      B.    Astra's Motivations and Incentives at the Time of the Hypothetical Negotiation. ................................................................10

            1.    The Importance of Prilosec® and Nexium® to Astra. .............10

            2.    The Relative Cost of Nexium® and Generic Omeprazole to Third-Party Payers in November 2003.................................11

            3.    The PPI Market After Apotex's "At Risk" Launch.................15

            4.    Astra's Expectations Regarding the Impact of a *Licensed* Apotex Product on Prilosec® and Nexium®...........................16

            5.    The Expected and Actual Impact of Prilosec OTC® on Prilosec®, Nexium®, and Generic Omeprazole......................17

      C.    Apotex's Motivations, Incentives, and Capabilities at the Time of the Hypothetical Negotiation. ........................................................19

CASE PARTICIPANTS ONLY

1.   Apotex Expected to, and Did, Earn Substantial Sales and
     Profits from Omeprazole..........................................................19

2.   Apotex Also Expected that Adding Omeprazole Would
     Increase Sales of Other Products. ...........................................20

3.   Apotex Did Not Have an Acceptable Noninfringing
     Alternative in November 2003..................................................21

4.   Apotex Recognized that Time Was of the Essence. .................24

D.   License and Settlement Agreements Involving the Patents. ...............24

E.   The District Court's Opinion and Order. ...........................................29

SUMMARY OF ARGUMENT ................................................................................32

STANDARD OF REVIEW .....................................................................................34

ARGUMENT .........................................................................................................35

I.   The District Court Properly Awarded Astra A Reasonable Royalty
     Equal To 50% Of Apotex's Profits On Infringing Sales By Applying
     The *Georgia-Pacific* Hypothetical Negotiation Framework.........................35

A.   Apotex's Arguments Rest on a Fundamental Misunderstanding
     of Reasonable Royalty Damages...........................................................36

B.   The District Court Properly Applied the Hypothetical
     Negotiation Analysis to Determine the Reasonable Royalty in
     this Case. ...............................................................................................39

1.   The District Court Correctly Found that Astra Would
     Have Demanded a Substantial Royalty. ...................................40

a.   Astra Would Have Reasonably Expected that
     Licensed Apotex Omeprazole Products Would
     Harm Astra's Substantial Nexium® and Prilosec®
     Sales and Profits. .........................................................40

b.   Apotex's Argument that its Licensed Products
     Would Not Have Been Expected to Harm Astra

Ignores the Reality of the PPI Market in November 2003. ...........................................................44

    c.    Apotex's Argument that the Court Improperly Ignored the Impact of Apotex's *Actual* "At Risk" Entry and Only Considered the Impact of Apotex's *Expected* Licensed Entry is Wrong as a Matter of Fact and Law...............................................46

    2.    The District Court Correctly Concluded that Apotex Would Have Been Willing to Pay a Substantial Royalty. ........48

C.    The District Court Correctly Concluded that Astra's Licenses and Other Agreements Support the Reasonable Royalty Determination.....................................................................52

II.    The District Court Properly Held That The Royalty Should Be Based On Apotex's Infringing Omeprazole Products, Rather Than A Single Element Of Those Products.........................................................56

III.    The District Court Properly Concluded That The Hypothetical Negotiation Would Have Included The Pediatric Exclusivity Period...........58

CONCLUSION ............................................................................64

**CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rule 28(d)(1)(B), Plaintiffs-Appellees have prepared a public version of their brief in which they have redacted certain confidential information.  Specifically, the material omitted on pp. 15, 21, 26, 30, 43, 48, and 60 contains references to information that has been designated confidential by either Plaintiffs-Appellees or Defendants-Appellants pursuant to the governing Protective Orders.  In particular, the material omitted from these pages contains confidential business information of the parties:  the material omitted at p. 15 describes Astra proprietary information regarding the generic omeprazole market; the material omitted at p. 21 describes Apotex's sales information; the material omitted at p. 26 describes confidential details of an agreement between Astra and Procter & Gamble; the material omitted at p. 30 describes Apotex's sales information; the material omitted at p. 43 describes Apotex's pricing decisions; the material omitted on page 48 describes Apotex's sales information; and the material omitted at p. 60 describes details of a confidential settlement offer received by Astra.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Amsted Indus. Inc. v. Nat'l Castings, Inc.,
No. 88-cv-924, 1990 WL 106548 (N.D. Ill. July 11, 1990) ..............................61

Apotex Inc. v. United States Food & Drug Admin.,
508 F. Supp. 2d 78 (D.D.C. 2007) ....................................................................10

Apple Inc. v. Motorola, Inc.,
Nos. 2012-1548, 2012-1549, 2014 WL 1646435 (Fed. Cir.
April 25, 2014) ....................................................................36, 38, 39, 51, 56

Aro Mfg. Co. v. Convertible Top Replacement Co.,
377 U.S. 476 (1964) .............................................................................37, 39

Aro Mfg. Co. v. Convertible Top Replacement Co.,
365 U.S. 336 (1961) ..................................................................................56

Boehringer Ingelheim Corp. v. Shalala,
993 F. Supp. 1 (D.D.C. 1997) ......................................................................58

Brulotte v. Thys Co.,
379 U.S. 29 (1964) ...............................................................29, 30, 34, 59

Deere & Co. v. Int'l Harvester Co.,
710 F.2d 1551 (Fed. Cir. 1983) ...............................................................49, 62

Fromson v. Western Litho Plate & Supply Co.,
853 F.2d 1568 (Fed. Cir. 1988), *overruled in part on other
grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge
GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) .........................36, 38, 39

General Motors Corp. v. Devex Corp.,
461 U.S. 648 (1983) .........................................................................37, 38, 63

Georgia-Pacific Corp. v. United States Plywood Corp.,
318 F. Supp. 1116 (S.D.N.Y. 1970) .........................................................*passim*

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004) ........................................................43

*Grain Processing Corp. v. American Maize-Products Co.*,
    185 F.3d 1341 (Fed. Cir. 1999) ................................................39, 61

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983) .........................................36, 47, 51

*Home Savings of Am., FSB v. United States*,
    399 F.3d 1341 (Fed. Cir. 2005) ................................................34, 35

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ..............................................33, 38, 57

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ..................................................*passim*

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008) ................................................50, 51

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996) ........................................................61

*Merck & Co. v. Mediplan Health Consulting, Inc.*,
    No. 05-Civ-3650(DC), 696(DC), 698(DC), 699(DC), 700(DC),
    701(DC), 2006 WL 1676229 (S.D.N.Y. June 14, 2006)..................61

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ............................................37, 38, 55

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) ................................................47, 50

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) (en banc) ....................................41, 50

*Sanofi-Aventis v. Apotex Inc.*,
    659 F.3d 1171 (Fed. Cir. 2012) ........................................................35

*SEB S.A. v. Montgomery Ward & Co.*,
    594 F.3d 1360 (Fed. Cir. 2010) ........................................................40

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
    289 U.S. 689 (1933) ...................................................................... 48

*Smithkline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ...................................................... 30

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
    926 F.2d 1161 (Fed. Cir. 1991) ................................................. 34, 35

*Stickle v. Heublein, Inc.*,
    716 F.2d 1550 (Fed. Cir. 1983) ................................................. 37, 61

*TWM Mfg. Co. v. Dura Corp.*,
    789 F.2d 895 (Fed. Cir. 1986) ........................................................ 49

## FEDERAL STATUTES

35 U.S.C. § 271(e)(4) ....................................................................... 62, 63

35 U.S.C. § 284 ................................................................................ 36, 61

## OTHER AUTHORITIES

Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent
    Notice and Remedies with Competition* (March 2010) ...................... 50

John M. Skenyon *et al.*, *Patent Damages Law and Practice* § 1:15 (2008) ........... 55

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Plaintiffs-Appellees AstraZeneca AB, Aktiebolaget Hässle, KBI-E Inc., KBI Inc., and AstraZeneca LP (collectively, "Astra") state as follows:

(a)     This Court affirmed the judgment of the United States District Court for the Southern District of New York as to the validity of U.S. Patent Nos. 4,786,505 and 4,853,230 (the "'505 and '230 patents" or collectively, the "Patents") and the infringement of those patents by Apotex Corp., Apotex Inc., and TorPharm Inc. (collectively, "Apotex") and another generic drug manufacturer in *In re Omeprazole Patent Litig.*, 536 F.3d 1361 (Fed. Cir. 2008).  The panel was Judges Lourie, Bryson, and Gajarsa.

(b)     This Court affirmed the judgment of the district court as to the validity of the Patents and the non-infringement of those patents by two generic drug manufacturers in *In re Omeprazole Patent Litig.*, 281 F. App'x 974 (Fed. Cir. 2008).  The panel again was Judges Lourie, Bryson, and Gajarsa.

(c)     Counsel for Astra are not aware of any other cases in this Court or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

# INTRODUCTION

Apotex's brief largely tracks its pre-trial filings—telling a story in which Astra, at the time of Apotex's infringing entry into the market in November 2003, had already decided that Prilosec® was a lost cause, anticipated that Apotex would cause no additional harm to Astra's proton pump inhibitor ("PPI") franchise, and therefore would have licensed Apotex at a nominal royalty in order to extract some remaining shred of value from its "fully genericized" former blockbuster drug. The problem with Apotex's pre-trial story is that the evidence at trial—as the district court explained in a detailed, 128-page opinion—was very different.

At its peak, Astra's Prilosec®—the first PPI in the market—was the world's largest selling prescription drug. (A11-12.) With Astra's patent on the omeprazole molecule scheduled to expire in 2001 (A39), this "huge, lucrative" market (A38) attracted substantial interest from generic producers. Apotex, in particular, identified omeprazole as an incredibly attractive opportunity (A38-39), because it not only offered huge profits (A103), but also would boost sales of other Apotex products (A104-05). But Apotex had a problem: although some of its generic competitors had developed omeprazole formulations (themselves patented) that avoided Astra's '505 and '230 formulation patents, Apotex, despite years of trying, had utterly failed. Thus, the only lawful way Apotex could seize this unique opportunity was to obtain a license.

Astra, for its part, did not regard Prilosec® as a lost cause. Despite generic competition, Astra still sold large volumes of Prilosec®—more than $850 million in 2003. (A40.) More important, omeprazole, and in particular omeprazole price levels, were essential to Astra's efforts to establish its second-generation PPI, Nexium®, as the next drug of choice in the PPI market, particularly for large health plans and third-party payers ("TPPs") who paid for the vast majority of Nexium® prescriptions and exerted enormous influence over which drug patients actually used. It was vital to those efforts that, whatever might happen to omeprazole sales volumes in general or Prilosec® sales in particular, the difference between Nexium® and omeprazole prices remain at a level that made Nexium® not only clinically, but economically, the better choice.

That, in fact, was the state of affairs in November 2003, when the hypothetical negotiation would have occurred. Generic omeprazole was on the market and had taken market share from Prilosec®, but omeprazole prices nonetheless remained relatively high, so that large health plans and TPPs continued to support Nexium®. Prilosec OTC®, sold under license from Astra, was also on the market, but because of insurer reimbursement policies, Prilosec OTC® was more expensive for most consumers than prescription omeprazole (A49), further supporting Astra's efforts to promote Nexium®. Those efforts were hugely successful, with Nexium® sales of $2.5 billion in 2003 (A40), in large part because

2

high omeprazole prices made Nexium® an economically attractive alternative.  As a result, Astra, at this point, would have wanted to avoid doing anything that might cause a significant drop in omeprazole prices.  And that is just what Astra would have expected a new, *licensed* generic competitor like Apotex to do—cut prices to take market share from established generic producers—and because it would be licensed and not "at risk" of infringement liability, it would be able to do so. (A52.)

Thus, in November 2003, Apotex saw an opportunity for huge profits but could not enter the market, while Astra saw an enormous risk to both its remaining Prilosec® business and its $2.5 billion Nexium® franchise if Apotex entered as a licensed competitor.  Against this backdrop, as the district court held, Astra established "not just by a preponderance of the evidence but convincingly" through "overwhelming evidence" that the hypothetical negotiation would have produced a royalty of 50% of Apotex's omeprazole profits—an amount that would compensate Astra for the anticipated harm that Apotex's entry would cause, while leaving Apotex with very substantial profits it otherwise would have to forgo. (A116, A125-27.)

Because Apotex cannot credibly contend that the district court's factual findings are clearly erroneous, it instead concocts supposed legal errors that this Court must correct.  Its principal argument is that the royalty the district court set is

divorced from any harm that Astra suffered. Apotex not only ignores the court's

findings, but forgets that it agreed that the proper measure of damages is a

reasonable royalty and that the proper way to determine that royalty is the

*Georgia-Pacific* hypothetical negotiation approach, in which the court determines

on an *ex ante* basis how the parties would have viewed the market before

infringement. As the court found, and Apotex does not dispute, the parties in

November 2003 would have understood that Apotex's entry as a *licensed*

competitor would have had a far greater impact on omeprazole prices—and thus on

Astra's Prilosec® and Nexium® sales—than the mere addition of another

*unlicensed*, "at risk" generic producer. (A9, A40-41, A52, A115-20.) The

hypothetical negotiation would have reflected that reality, and the court's

unchallenged findings establish the result.

Apotex next asserts that the court failed to consider comparable licenses,

devoting pages of its brief to such supposed licenses (Apotex Br. 21-23), only to

concede later, in a footnote, that they did not actually cover omeprazole (*id*. at 44

n.18). Apotex also asserts that the court misapplied the entire market value rule,

but Apotex misunderstands both the rule and the scope of the patents it infringed.

Finally, Apotex asserts that the court erred by awarding damages for Apotex's

sales during Astra's period of pediatric exclusivity. But, this Court has already

determined that Astra is entitled to a remedy for sales during the exclusivity period

and, without damages, Astra would have no remedy. The judgment should be affirmed.

## STATEMENT OF ISSUES

1.    Whether the district court committed clear error or abused its discretion in determining reasonable royalty damages based on the agreed "hypothetical negotiation" methodology.

2.    Whether the district court properly based its reasonable royalty award on the entire infringing product, rather than a supposed "component" of that product, where the patents that Apotex infringed claim the entire product.

3.    Whether the district court properly included Apotex's sales during the pediatric exclusivity period in the damages award where, absent a license from Astra, Apotex was barred from selling during that period.

## STATEMENT OF THE CASE

### I.    Procedural Background.

This appeal involves the damages phase of litigation under the Hatch-Waxman Act. (A3-4, A33420[¶¶16, 18].) On April 19, 2001, Astra sued Apotex for infringing the '505 and '230 patents. (A33420[¶18].) On November 12, 2003, Apotex launched its omeprazole products "at risk"—*i.e.*, before the infringement suit had been resolved. (A33421[¶28].) Between November 12, 2003, and October 20, 2007, Apotex had net omeprazole sales of $201,791,249. (A72.)

On May 31, 2007, the district court found that the Patents were not invalid and that Apotex's omeprazole products infringed. (A33421[¶¶30-31], A6388-508.) This Court affirmed those rulings on August 20, 2008, and remanded to determine damages. (A33421[¶33], A2405-22.)

Astra thereafter chose to "seek damages under a theory of a reasonable royalty." (A33439[¶1].) The parties stipulated that "any hypothetical negotiation between [them] would have occurred in early November 2003, just before the launch of [Apotex's] generic omeprazole product on November 12, 2003." (A33439[¶1].)

In November 2013, the district court conducted an eight-day bench trial on damages. (A32225-591.) On December 3, 2013, the court issued a 128-page Opinion and Order (A1-128), which concluded that "Astra is entitled to a reasonable royalty for Apotex's infringement of the Patents in the amount of 50% of Apotex's profits on its infringing sales or $76,021,994.50." (A7.)

## II.    Statement Of Facts.

### A.    The PPI Market Before the Hypothetical Negotiation.

#### 1.    Astra's Development of Omeprazole and the Patents.

In January 1979, a team of Astra scientists discovered omeprazole, a drug that inhibits gastric acid secretion. (A6269.) Even after that discovery, developing a commercially viable formulation proved to be very difficult due to omeprazole's chemical features. (A6269-70, A6403.)

After years of experimentation, Astra developed the formulation claimed in the Patents, which comprises omeprazole with: (1) an alkaline reacting compound in the core, which was necessary to provide sufficient stability, (2) a water soluble inert subcoat, and (3) an enteric coating. (A197-218, A6270-72, A6277, A6403-04, A33418[¶4].) This formulation was used in Prilosec®. (A6272, A33418[¶7].)

## 2. Prilosec®, Nexium®, and the Other PPIs.

Prilosec®, which Astra launched in October 1989, was a revolutionary drug and the first in the new PPI category. (A17439[¶6], A17460-61[¶¶9-10], A33419[¶8].) After Astra launched Prilosec®, three other branded prescription PPIs were introduced between 1995 and 2000. (A33419[¶¶9-11].) Despite this competition, Prilosec® became one of the most widely prescribed drugs in history, and was the "gold standard" among PPIs. (A11-12, A6401, A17439[¶6], A17461[¶12].) In 2000, Prilosec® had U.S. sales of $4.1 billion, representing over 50% of Astra's total U.S. sales. (A17439[¶6], A17461-62[¶13], A33422[¶38].) Prilosec® was "a blockbuster drug, with extraordinary sales success." (A11.)

In March 2001, Astra introduced a new PPI, Nexium®. (A33419[¶12].) Prilosec® and Nexium® are different, but chemically related, drugs. (A32705, A32728.) Nexium® provided clinical benefits over Prilosec® for certain patients. (A20-21, A17462-63[¶16], A32734-35.)

Upon launching Nexium®, Astra pursued a strategy to switch Prilosec®
users to Nexium® when medically appropriate.  (A19-21, A17463[¶17].)  Astra's
strategy was successful, and Nexium® quickly became a blockbuster.  (A17463-
64[¶18].)  From its launch through November 2003, Nexium® steadily gained
market share.  (A17433, A17703-04[¶14].)  U.S. sales of Nexium® were $1.5
billion in 2002 and $2.5 billion in 2003.  (A17439[¶7], A17463-64[¶18].)

### 3.    Astra's Litigation Against Generic Manufacturers.

Beginning in 1997, in anticipation of the 2001 expiration of Astra's
omeprazole molecule patent, multiple generic producers, including Apotex, filed
Abbreviated New Drug Applications seeking approval to market generic
omeprazole.  (A3, A12, A33419-20[¶¶14-15, 18].)

Between May 1998 and April 2001, Astra filed infringement lawsuits
against those companies, which the district court divided into two groups:  (1) the
"First Wave Defendants" were Andrx, Genpharm, KUDCo, and Cheminor; (2) the
"Second Wave Defendants" were Apotex, Impax, Lek, and Mylan.  (A33419-
20[¶¶16-18].)

In 2002, the court found that the Patents were not invalid and that the
omeprazole products of every First Wave Defendant, except KUDCo, infringed.
(A33420[¶¶20-21], A6257-6387.)  Of particular significance to Apotex, given that
its sole argument for noninfringement was that it did not apply a separate subcoat

8

to its product during manufacture, the court held that the Patents covered products in which the subcoating was formed not during manufacture, but *in situ* (*i.e.*, in the product), and that Andrx's omeprazole products therefore infringed.  (A13-14, A6292-93, A6330-37.)

In December 2002, KUDCo launched its omeprazole products; it remained the only generic supplier until August 2003.  (A14-15, A33420[¶¶22-23].)

On December 11, 2003, this Court affirmed the First Wave decision. (A33420[¶24], A4209-16.)

All of the Second Wave Defendants launched their omeprazole products "at risk."  (A6406, A6426, A6442, A6456, A6466.)  Mylan and Lek launched their products in August 2003, followed by Apotex on November 12, 2003, and Impax (through an arrangement with Teva) in September 2004.  (A15, A75, A33421[¶¶25-29].)

In 2006, the district court tried Astra's claims against the Second Wave Defendants.  (A33421[¶30].)  In May 2007, it found that the Patents were not invalid, that Apotex's and Impax's products infringed, and that Mylan's and Lek's products did not.  (A33421[¶31].)  The court held that Apotex infringed the Patents because its product, like Andrx's, had a subcoating that formed *in situ*. (A33421[¶32].)

Although the Patents expired on April 20, 2007, the FDA had granted Astra "pediatric exclusivity" through October 20, 2007. (A6499[nn.4, 6].) On June 14, 2007, the court ordered that the effective approval date for Apotex's ANDA could be no earlier than October 20, 2007. (A78, A33421[¶34], A35564-65[¶¶1-3].) On June 28, 2007, the FDA revoked its approval of Apotex's ANDA until at least October 20, 2007. (A78, A33421[¶35].) Apotex sued the FDA to enjoin the revocation, but on September 17, 2007, Apotex's request was denied. (A78-79; *Apotex Inc. v. United States Food & Drug Admin.*, 508 F. Supp. 2d 78 (D.D.C. 2007).)

This Court affirmed the Second Wave decision on June 10 and August 20, 2008. (A79, A33421[¶33], A2405-22, A36072-77.) It held, among other things, that the district court had correctly interpreted the Hatch-Waxman Act to provide a "post-expiration remedy for infringement" by preventing sales during the pediatric exclusivity period. (A79, A2411-13, A2422.)

## B.    Astra's Motivations and Incentives at the Time of the Hypothetical Negotiation.

### 1.    The Importance of Prilosec® and Nexium® to Astra.

As of November 2003, Prilosec® remained very important to Astra. Prilosec® had retained nearly 30% of the omeprazole market (A6658), and although sales had declined from their peak, "Astra still earned substantial profits on sales of Prilosec®." (A9.) Prilosec® had net sales of $865 million in 2003 and

10

$361 million in 2004.  (A40, A120, A33096.)  Astra viewed these sales as "worthy of protection" (A32280-81[224:18-226:21]), largely because it expected that patients who remained on Prilosec® were more likely to transition to Nexium®.  (A17469-70[¶32], A32286[242:13-243:10], A32307[327:4-14].)

Moreover, by November 2003, Astra was "even more concern[ed]" with Nexium®.  (A9.)  Nexium® had become a blockbuster drug, critical to Astra's success.  Nexium®'s 2003 net sales of roughly $2.5 billion represented 28% of Astra's U.S. total.  (A40, A17463-64[¶18], A33104, A33196.)  In 2004, Nexium® net sales exceeded $2.7 billion.  (A17192.)

### 2.    The Relative Cost of Nexium® and Generic Omeprazole to Third-Party Payers in November 2003.

Based on detailed evidence concerning the PPI market, the court found that competition from generic omeprazole was a significant threat to Nexium®.

As the court found, TPPs play an important role in determining the utilization of any prescription drug.  (A24-30.)  TPPs influence whether a generic or brand name drug is used, and if a branded drug, which one.  (A26, A17467-69[¶¶28-30], A17654-61[¶¶39-55], A17734[¶62], A31809-10[¶¶41-43].)  TPPs exercise this influence by, among other things, (a) creating tiered formularies—lists of drugs for which the TPP will reimburse the pharmacy—with differential co-payments, and (b) imposing restrictions (*e.g.*, prior authorization requirements and limitations on use) on particular drugs.  (A26-28, A17468-69[¶¶29-30],

A17654-61[¶¶39-55], A17734[¶62], A31807[¶35].)  Branded drug manufacturers

often pay rebates to TPPs in exchange for favorable formulary status or to avoid

such  restrictions.  (A26-28, A17469-71[¶¶32-33], A17661-64[¶¶56-62],

A17711[¶27], A32430[818:6-9, 819:11-14].)

TPPs encourage use of drugs with the lowest net cost to them.  (A26-28,

A17467-69[¶¶27-31], A17734-35[¶63], A31809-10[¶¶41-43].)  A TPP's net cost is

the total amount paid to the pharmacy for the drug, *less* the patient's co-payment,

*less* any manufacturer rebate.  (A30-34, A17467-68[¶28], A17710-17[¶¶24-36],

A32429[814:20-816:9].)  TPPs also consider differences in the average number of

pills taken for a given course of treatment.  Considering these factors, a TPP's net

cost for a branded drug can be lower than for a generic, typically because the

patient's co-payment is smaller for generic drugs and because generic companies

rarely pay rebates.  (A17472-73[¶39], A31817-18[¶64], A32430[819:15-19].)

The district court found that "there is evidence that the effective cost of

Nexium® therapy was, perhaps remarkably since Nexium® was the most recently

patented PPI, lower than the cost of omeprazole therapy during the period from

December 2002 through November 2003, at least from the perspective of certain

major TPPs."  (A30.)  This phenomenon principally resulted from two factors.

*First*, "the evidence regarding the omeprazole market as of November 2003

indicates that generic drug prices remained relatively and uncharacteristically

high." (A18; *see also* A9, A40.) Specifically, from December 2002 to August 2003, "KUDCo kept the price of its omeprazole product high" because it was the only generic supplier and lacked sufficient capacity to supply the market. (A14-15, A17471-72[¶34], A17703[¶12], A32236[47:7-20], A32383-84[632:16-635:18], A33420[¶¶22-23], A35847[¶20].) TPPs were "unimpressed" with KUDCo's prices and did not try to drive patients to generic omeprazole or away from Prilosec® or Nexium®. (A15 n.6, A17339-46, A32286-90[244:14-261:20], A32430[820:13-23], A32433[832:4-22], A32828.)

Then, after the August 2003 "at risk" launches of Mylan's and Lek's products, "[t]he price[] of generic omeprazole … declined, but not significantly." (A15-16; *see also* A117, A17472-75[¶¶35, 39, 41-42], A17668-69[¶74], A17749, A32383-84[632:16-635:18].)[1] Key to Nexium®'s success, these modest price declines were not significant enough to cause TPPs to take aggressive actions to promote the use of omeprazole over Prilosec® or Nexium®. (A16-17, A40, A3744, A6665, A17474-75[¶¶41-42], A32290-92[261:21-267:18], A32302[307:18-308:22], A32457[926:24-927:23], A32643.) Moreover, by

---

[1] Apotex emphasizes the discount KUDCo offered to a large mail order pharmacy in August 2003. (Apotex Br. 15-16.) However, as the court found, mail order is a unique distribution channel where manufacturers are willing to provide deep discounts, and it represented a small segment of the prescription drug market in 2003 and only about 8% of Nexium® sales. (A32[n.15], A3202, A17474[n.2], A17713-14[n.18], A32277-78[209:3-210:19, 213:13-214:3, 214:16-215:10], A32456[921:10-922:19].)

November 2003, the price of omeprazole had not fallen sufficiently for TPPs to set maximum allowable cost limits on reimbursement for omeprazole.  (A21, A26-27, A40, A17474-75[¶42], A17666-67[¶70], A32392[667:21-668:5], A32545[1273:4-1274:18].)

*Second*, Astra paid TPPs "aggressive rebates" on Nexium® in order to obtain favorable formulary status and avoid use restrictions.  (A9, A30, A17434, A17469-73[¶¶32-33, 39], A17711-13[¶¶28-29].)  Generic omeprazole suppliers did not provide such rebates.  (A17713-14[¶30].)[2]

The court found that a study of pharmacy data by Astra's expert Dr. Rausser "demonstrated that the effective cost of Nexium® therapy for those TPPs to whom Astra offered rebates was often less than omeprazole therapy during the period between December 2002 and November 2003."  (A32-34; *see also* A17719-33[¶¶40-60].)  The court further found that Dr. Rausser's study "corroborates Astra's own contemporaneous internal analysis."  (A34; *see also* A32682, A17472-73[¶39].)

---

[2] Nexium® was also less expensive than omeprazole for many TPPs because patients paid higher co-payments for Nexium® than for omeprazole, reducing Nexium's relative cost to TPPs (A34, A17711[¶26], A17733[Table 19], A32682), and because, on average, patients take fewer Nexium® pills than omeprazole pills per day (A32, A17714-15[¶¶31-33]).

Accordingly, the court concluded "that for many TPPs during the period in which the hypothetical negotiation was occurring, the cost of Nexium® therapy remained quite close to that of treatment with generic omeprazole." (A37.)

### 3.    The PPI Market After Apotex's "At Risk" Launch.

The district court found that "Astra had every reason to expect that the launch of a fourth generic, particularly for a licensed product, would swiftly accelerate the decline in omeprazole prices." (A41.) Evidence regarding the PPI market after Apotex's "at risk" launch bolstered the court's finding that Apotex's *licensed* entry would have posed a real and perceived threat to Nexium®.

When Apotex launched "at risk" on November 12, 2003, it cut the price to gain market share. (A71, A2380[54:23-55:4], A2439[63:20-64:5], A2452[114:16-23], A2496[22:9-17], A2525[141:3-7], A17735-36[¶64], A32435[840:2-9], A33421[¶28].) ███████████████████████████████████

████████████████████████████████████████████

███████████████████ (A28655.) Likewise, Dr. Rausser's analysis showed that omeprazole prices continued to decline after Apotex's entry. (A72, A17761, A32384[634:7-636:18], A32395[677:1-18], A32478-79[1009:20-1010:12].)[3]

---

[3] Academic research and an FDA study confirmed that the fourth generic entrant usually has a substantial impact on price. (A6802, A18301, A18386.)

Corroborating the link between omeprazole and Nexium® pricing, Astra's

Nexium® rebates increased dramatically after Apotex's entry.  (A17188, A17192,

A17762, A32302[307:18-309:4], A32331-34[424:8-433:9], A32385-86[639:23-

643:4], A32395[677:1-678:23], A32456-57[924:23-926:6], A33104.)  The court

found:  "In sum, the post November 2003 evidence supports the idea that Astra

offered increasing rebates on Nexium® to compete in the PPI market, and that the

price of generic omeprazole was one factor among several influencing Nexium's

competitive position."  (A69; *see also* A65.)

### 4. Astra's Expectations Regarding the Impact of a *Licensed* Apotex Product on Prilosec® and Nexium®.

After Mylan and Lek launched "at risk" in August 2003, omeprazole prices

declined modestly.  (A117.)  However, Astra understood—and Apotex's CEO and

other witnesses admitted—that "at risk" generic entrants are less likely than

licensed or noninfringing entrants to aggressively cut prices because they want to

ensure that their revenues are sufficient to cover any infringement damages.

(A2498-99[32:20-34:5], A17472[¶35], A17476[¶45], A29820, A32384[633:12-

634:3], A32396[682:1-684:8], A32436[841:19-842:12], A32492[1064:19-25].)  As

the district court found, "the uncertainty about infringement that accompanies an

at-risk launch makes an at-risk generic drug manufacturer hesitant to cut prices,"

while a manufacturer with a license can "engage in price competition without any

constraint imposed by litigation risk."  (A15-16, A117.)

Thus, the court found, Astra would have been concerned that a *licensed*
Apotex product would have caused a more dramatic reduction in omeprazole
prices.  (A9, A41, A52, A116-17, A17475-77[¶¶44-46], A17669[¶75], A17735-
36[¶64], A32385[638:11-639:22].)  Further, Astra would have been concerned that
such a price reduction would (a) cause TPPs to take negative action against
Nexium®, which could dramatically reduce its sales, and/or (b) require Astra to
increase Nexium® rebates.  (A9, A52, A116-17, A119-20, A17476-78[¶¶46-48],
A17669[¶76], A17734-39[¶¶63-68], A32281[228:4-6], A32287[248:12-14],
A32293[272:9-16], A32302[307:18-308:22], A32385[638:11-639:22].)

### 5.    The Expected and Actual Impact of Prilosec OTC® on Prilosec®, Nexium®, and Generic Omeprazole.

Procter & Gamble ("P&G") launched Prilosec OTC® on September 15,
2003.  (A33419[¶13].)  Apotex argues that Astra would not have been concerned
with Apotex's omeprazole product because, by November 2003, Prilosec OTC®
had already caused a reduction in Prilosec® and Nexium® sales.  (Apotex Br. 17-
19, 32-34.)  The district court found otherwise.

As the court concluded, the introduction of Prilosec OTC® "caused a
substantial drop in the market share of generic omeprazole and a further drop in the
market share of Prilosec®."  (A23; *see also* A52, A69-71, A124, A17445-46[¶33],
A32280[221:19-222:9], A32387[645:18-646:8], A32392[665:7-666:2].)  However,
the relevant question is whether Prilosec OTC® caused a meaningful reduction in

17

omeprazole *prices*.  The court found it did not; "the presence of Prilosec OTC® in the marketplace did not have any effect on omeprazole pricing, because the systems through which prescription and OTC drugs are paid for are largely separate."  (A23; *see also* A124-25 ("Apotex failed to show at trial that [Prilosec OTC®'s] impact on sales to consumers actually had any significant impact whatsoever on formulary position or the price competition within the prescription PPI market.").)  That finding was fully supported by the evidence.

Pharmacies do not drive price competition between generic omeprazole and Prilosec OTC®.  Omeprazole manufacturers compete with each other to be on the pharmacy shelf *behind the counter*, but Prilosec OTC® was sold in pharmacy *aisles*, where it competed for shelf space only with other OTC products.  (A124-25, A32443-44[872:22-874:6].)  Nor did TPPs or insured consumers drive price competition between generic omeprazole and Prilosec OTC®, because while most TPPs covered omeprazole, very few TPPs covered Prilosec OTC®.  (A49, A71, A125, A17478-79[¶51], A17670-74[¶¶77-82], A17742-45[¶¶72-76], A32278-79[215:11-220:20], A32387[646:9-648:24], A34849.)  As a result, Prilosec OTC® was more expensive than omeprazole for insured consumers who pay only a co-payment for prescription drugs, but full price for OTC drugs.  (A49, A71, A29190, A29825-26, A32278-79[216:15-218:1, 219:2-25], A32387[648:11-24].)  And, although Prilosec OTC® was typically cheaper than omeprazole for uninsured

consumers, such consumers comprised only 6% of the PPI market and therefore did not drive price competition between the two drugs. (A3502, A32279-80[218:15-219:1, 220:21-221:18], A32304-05[317:3-318:11], A32387-88[648:25-649:15].) Indeed, Apotex admits that in August 2004, nearly a year after the entry of Prilosec OTC®, "generic omeprazole was still significantly more expensive than … Prilosec OTC." (Apotex Br. 20.)

### C. Apotex's Motivations, Incentives, and Capabilities at the Time of the Hypothetical Negotiation.

#### 1. Apotex Expected to, and Did, Earn Substantial Sales and Profits from Omeprazole.

Before its omeprazole launch, Apotex prepared projections of its expected market share and profits. (A53, A2428[18:8-19:2], A16090-91.) They show that Apotex expected it would quickly gain share and that its products would be highly profitable, with anticipated revenue of more than $100 million annually and profit margins above 90%. (A53, A103-04, A16402-13, A16419-22.) In a June 2003 projection, Apotex forecast that its share of the omeprazole market would be 5% at launch, 15% in 2004, and 25% thereafter, with net sales of roughly $581 million for its first five years. (A53, A16392-401.)

Immediately preceding its launch in November 2003, Apotex prepared shorter term projections. (A53, A16419-27.) Apotex forecast that it would capture 7% of the market within the first eight months and that its omeprazole sales would

yield a profit margin of 92.5%, more than twice the average margin on its other products.  (A53, A123, A16419-22.)

As the court found, Apotex's "expectations were reasonable, and Apotex achieved sales and growth roughly consistent with them." (A104.)  Although Apotex was the fourth entrant, by December 2004, nearly 27% of all generic omeprazole prescriptions were filled with Apotex's product.  (A16021-29.) Apotex became the leading generic in 2005—with a market share above 30%—a position it maintained through 2007.  (Id.)  After initially exceeding its 92.5% profit projection, Apotex's margins declined but still remained very high, averaging 75.3% over the entire infringement period.  (A72.)  In 2007, omeprazole was Apotex's second largest selling, and most profitable, product.  (A71-72.)

### 2. Apotex Also Expected that Adding Omeprazole Would Increase Sales of Other Products.

Apotex also would have expected that selling omeprazole would increase sales of its other products.  (A104.)  As Apotex explained in opposing the FDA's withdrawal of approval of its ANDA in 2007, omeprazole helps Apotex sell other products because "customers tend to expand upon their current base of sales from current suppliers." (A105, A16047[¶24].)  This is particularly true because omeprazole was a "blockbuster" drug (A11), and in Apotex's view, "the presence of a blockbuster drug in the product line is perhaps the single most effective way to increase sales across all product lines." (A105, A16063[¶30].)

20

CASE PARTICIPANTS ONLY

███████████████████████████████████

████████████████████████████ (A16486, A16490, A16542,

A16612, A35964[¶66].)

### 3.   Apotex Did Not Have an Acceptable Noninfringing Alternative in November 2003.

As of November 2003, Apotex did not have available—nor did it ever

develop—an acceptable noninfringing omeprazole product.  (A8, A2513[90:6-

10].)  The district court found that "Apotex would have had no reasonable

confidence in the Fall of 2003 that it could find a non-infringing formulation for

omeprazole that would obtain FDA approval, much less one that could be

developed, tested, and approved without years of effort."  (A56-57.)  These

findings were supported by overwhelming evidence.

Apotex originally contended that it could have avoided infringement by:  (1)

modifying its existing infringing formulation; (2) copying other noninfringing

generic formulations; or (3) developing a microtablet formulation.  (A54.)  The

evidence demonstrated that none of these alternatives was viable.

Changes to Apotex's Existing Formulation.  Apotex asserted that it could

have modified its existing formulation to avoid infringement by:  (1) removing the

alkaline reacting compound ("ARC")—magnesium hydroxide—from its product

core; (2) preventing the *in situ* formation of an inert subcoat by changing the

binder used in its core; or (3) preventing the formation of the subcoat by changing

the enteric coating. (A57.) As the court found, Apotex's assertion that these changes would work was based on "pure speculation." (A108.)

As to the first, Apotex's CEO Dr. Sherman admitted—and the court previously found—that the magnesium hydroxide in the core of Apotex's infringing product stabilizes the omeprazole. (A109, A2548-49[36:23-37:7], A6457, A32530[1214:18-1215:8].) Thus, Astra's expert Dr. Davies testified that removing it was not a viable option.[4] (A17608-10[¶¶72-74], A32245[82:15-83:5].) Apotex's own experience confirmed this conclusion; it tried from August 1997 to December 1998 to make a formulation with no ARC, but this effort failed and was abandoned. (A58, A4410-20, A4431-32, A4457-73, A17748, A32504-08[1111:10-1127:19], A32530[1214:14-1216:1].)

Apotex's other alternatives—changing its binder or enteric coating—were likewise not viable options. (A59-60.) Relying on Dr. Davies, the court found that these changes would have degraded the product, presented significant technical challenges, and been unlikely to succeed. (A59-60, A108-09, A17612-23[¶¶78-94], A32246-47[86:4-15, 88:1-89:15]; *see also* A32531-32[1220:25-1223:9].)

---

[4] Apotex argued that other generic producers avoided use of an ARC. (A59.) But those products used patented ways of stabilizing the omeprazole that were not available to Apotex. (A59-62.) Moreover, the noninfringing formulations of others do not demonstrate that Apotex could have simply removed magnesium hydroxide from *its* formulation and still have had a viable product. (A17604-08[¶¶65-71], A32245[84:12-16].)

In the end, the court determined that it was "unlikely… that Apotex would have believed in November 2003 that any of these changes would have been successful or easy for it to pursue." (A57; *see also* A2562-63[89:17-25, 94:4-18, 95:18-25].)  Indeed, by the end of trial, "Apotex had largely abandoned its argument that it could have altered the infringing formulation successfully." (A108-09.)

Copying Other Formulations.  Nor was "direct copying" of the noninfringing products of KUDCo, Mylan, and Lek an option.  (A60-62, A17604-08[¶¶65-71], A17625-26[¶101].)  As the court recognized, those companies had patents on their formulations.  (A60-62, A110-11, A4350-409, A17604-08[¶¶65-71].)  Moreover, Apotex would have faced "very substantial research and development" expense, and a "lengthy delay" if it had tried to copy other products.  (A61-62; *see also* A17604-05[¶65], A17607[¶71], A17625-26[¶101].)

Microtablet Formulation.  Apotex finally contended that it could have revived its effort to develop a microtablet formulation that did not contain an ARC. (A62-64.)  But, Apotex had "tried mightily" for nearly two years to develop that formulation without success, ultimately abandoning those efforts because, as Apotex's own witness candidly admitted, the project was "a failure." (A64, A32508[1127:6-11]; s*ee also* A62-63, A2562-63[91:17-93:5], A4410-20, A4431-

32, A4457-73, A17587-95[¶¶36-52], A17748, A32245[82:21-83:5], A32504-08[1111:10-1127:19], A32530[1215:9-1216:1].)

### 4.    Apotex Recognized that Time Was of the Essence.

As the court found, "[t]ime was not on Apotex's side." (A106.) In November 2003, Apotex was already the fourth generic entrant. (A106.) If it had postponed entry further, Apotex would have "risked being effectively closed out of the market" altogether. (*Id.*)

Even if it were not completely shut out, delay would have been costly. Using Apotex's own projections, Astra's expert, Dr. Christine Meyer, determined—and the court accepted—that one, two, and three year delays would have cost Apotex 31.6%, 59.2%, and 84.5% of its projected profits, respectively. (A64, A16037-38, A35973-74[¶81].) Accordingly, Apotex would have been highly motivated to obtain an agreement quickly to maximize its potential profits. (A35974-75[¶82], A35997-98[¶126].)

### D.    License and Settlement Agreements Involving the Patents.

Astra's general policy is not to license others to sell products that will be sold in direct competition with its own products. (A43, A17440[¶9].) Consquently, Astra has never licensed the Patents to allow sales of generic omeprazole. (A17441-42[¶¶13-15], A32327[408:5-7].) Astra has generally licensed its patents only where the licensed product is either different than, or sold

through different channels than, Astra's products.  (A17440[¶9].)  Each of the four

license agreements which Astra entered in the 1990s that included the Patents

reflects this approach.  (A17440[¶9], A17442[¶15].)

Agreements with Takeda, Eisai, and Byk.  Between 1994 and 1996, Astra

entered into settlement agreements with Takeda and Eisai, the makers of two other

branded PPIs.  These agreements resolved proceedings in a number of countries in

which the companies had accused each other of infringement and sought to

invalidate each other's patents.  (A45-46, A3777-923, A3987-4029, A17442-

44[¶¶16-19, 24-27].)  Under the agreements, the parties dismissed their claims and

exchanged broad cross-licenses permitting each to manufacture, use, and sell their

respective PPIs.  (A17443-44[¶¶17, 25].)  The agreements thus allowed Astra to

continue to sell Prilosec® without risk of patent litigation and eliminated risks to

its patent portfolio.  (*Id.*, A32327-28[408:17-409:23].)  The Takeda agreement also

gave Astra valuable rights to market another drug, Atacand®.  (A17443[¶17],

A32328[409:24-410:8].)  The agreements did *not* grant either Takeda or Eisai the

right to make, use, or sell omeprazole.  (A45-46, A17443-44[¶¶18, 26].)

In 1996, Astra entered an agreement with Byk, which had developed another

PPI.  (A45, A3924-86.)  This agreement resolved patent litigation in several

countries.  (A45, A17443[¶20].)  The agreement granted Byk a royalty-free

worldwide license under the Patents and others to make, use, or sell its PPI; the

CONFIDENTIAL MATERIAL REDACTED

agreement did *not* grant Byk a license to make, use, or sell omeprazole. (A45-46, A17443[¶¶21-22].)

The "Prilosec OTC®" Agreement. Prilosec OTC® was launched in September 2003 pursuant to an agreement signed in 1997. (A46-47, A4030-170, A17444-45[¶¶28-30], A17446[¶35].) Under that agreement, P&G agreed to make initial payments totaling $56 million and then to pay a base royalty of 7% of net sales for the first twenty years, to be increased based on sales to a royalty as high as 40% on aggregate net sales above ███████ in the first three years after launch. (A47, A32330[419:5-19].) At the time of the agreement, Astra expected P&G to pay royalties at the maximum level, and it did. (A47, A17446[¶35], A32330[419:20-420:4].) Including all payments, P&G ultimately paid a blended royalty of approximately 23% of its net sales—and presumably a higher percentage of its profits—in the first three years after it launched Prilosec OTC®. (A47, A32331[422:5-22].)

P&G was required to use its "best efforts" to market Prilosec OTC®, and was expected to (and did) invest hundreds of millions of dollars in product development and marketing. (A47, A17446-47[¶36].) Astra expected P&G's efforts and investment in Prilosec OTC® to help, not hurt, its prescription PPI business. (A17445-46[¶¶31-34], A32329[413:22-416:23].) At the time the agreement was entered, Astra expected that the omeprazole market would be fully

"genericized" when P&G launched Prilosec OTC®, and that Prilosec OTC® would be a "potent competitor to generic prescription omeprazole." (A51.) Given that generic omeprazole prices had remained unusually and uncharacteristically high and Astra had retained more Prilosec® business than expected when Prilosec OTC® was launched in 2003, Astra was "not surprised" when Prilosec OTC® took "market share from both Prilosec® and prescription omeprazole." (A51-52.)

At the same time, as the court found, Astra expected Prilosec OTC® to drive Nexium® sales, not hinder them. (A52.) This was because patients who failed on Prilosec OTC® could be expected to see their doctors and be prescribed Nexium®, because it was the only PPI with proven clinical benefits over Prilosec®. (A21-23, A49-51, A121, A17445-46[¶¶31-34], A17465-67[¶¶23-26], A4248, A4250, A32756.) Astra also believed that the availability of Prilosec OTC® would downgrade omeprazole in consumers' and physicians' eyes, encouraging Nexium® use for appropriate patients. (A23, A49-50, A17445[¶32], A17465-66[¶24].)

The information available to Astra by November 2003, confirmed its expectation that Prilosec OTC® would not materially harm Nexium® sales or market share. (A23-24, A3744, A6661-62, A6689, A32639-43, A17478-79[¶¶49-52], A32469-70[972:20-975:18].)

<u>Settlement Negotiations with Andrx and Teva</u>.  Astra negotiated with Andrx and Teva to resolve its damages claims after they were found to infringe the Patents.  Andrx's formulation was found to infringe the Patents in the First Wave decision.  In 2005—when all that remained to be resolved was Astra's claim for damages—Andrx proposed a settlement in which it would receive a license to the Patents (and one other) and would pay Astra a royalty of 70% of its profits from the sale of 40mg strength omeprazole, over which the FDA had granted Andrx 180 days of exclusivity.  (A73-74, A16381-82.)  If the license also included 10mg and 20mg strengths, Andrx would pay 50% of its profits from those sales.  (A74.)  Astra rejected Andrx's offer, and no agreement was reached.  (A75.)

In 2010, after this Court affirmed the Second Wave decision, Astra reached an agreement with Teva and Impax resolving Astra's claim for damages based on Teva's sales of Impax's omeprazole product.  (A75-76, A35990-91[¶109], A4217-43.)  Teva agreed to pay a lump sum, which the court found to represent 54% of its profits on infringing sales.  (A76-77, A17436, A32418[770:10-771:8].) [5]

---

[5] In 2003, in exchange for what became the right to enter "at risk" as the fifth generic supplier in September 2004, Teva had agreed to pay Impax the cost of manufacture plus 35% of its profits from omeprazole sales for the first 18 months after launch, 40% for the next six months, and 50% thereafter.  (A75-76, A35945[¶24].)

### E.    The District Court's Opinion and Order.

On December 3, 2013, the court issued its Opinion and Order, which applied the *Georgia-Pacific* framework to determine reasonable royalty damages based on a hypothetical negotiation in November 2003.

The court began by addressing three legal arguments.  First, it rejected Apotex's claim that the royalty should be calculated based solely on the supposedly "'negligible' value of the subcoating" in Apotex's formulation.  (A82-85.)  Because there was "no evidence suggesting that the infringing subcoating is itself 'a saleable patent-practicing unit,'" the court held that it would be improper to attempt to isolate its value as distinct from the value of the marketable, patented capsules.  (A83 (quoting *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)).)  The court further noted that Apotex's claim that the subcoating has "no noticeable benefit" was refuted during the infringement proceedings, which demonstrated that "the subcoat was a crucial aspect of the process embodied in the '505 patent," and that earlier formulations, which lacked the subcoat, "were not commercially viable."  (A84-85.)

Second, the court rejected Apotex's claim that it would be "impermissible," under *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), to include sales during the

pediatric exclusivity period in any damages calculation.[6]  (A85-90.)  The court reasoned that "a license acquired in 2003 would have had to include both the right to sell omeprazole during the original term of the Patents and during Astra's pediatric exclusivity period."  (A87.)  The court found that such a license would not raise *Brulotte*'s concerns about efforts by patentees to "project [their] monopoly beyond the patent period" thus impairing "the free market," *see* 379 U.S. at 32-33, because, in "creating the pediatric exclusivity period, Congress obviously determined that there should be no 'free market' during those six months."  (A88.)

Third, the court addressed Apotex's claim that certain plaintiffs lacked standing, concluding that all but one has standing.[7]  (A94-100.)

Turning to the hypothetical negotiation, the court analyzed the basic bargaining position of each party.  (A102.)  It concluded that Astra would have had no desire to license Apotex given its perception "that any license granted to a

---

[6] ████████████████████████████████████████████████████
████████████████████  (A16036.)

[7] Apotex does not expressly challenge the findings with respect to standing, but it includes two footnotes that quibble with them.  (Apotex Br. 9 n.4, 39 n.15.)  An argument (if that is what this is) made only in footnotes is waived.  *Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).  In any event, the fact that multiple entities are involved is irrelevant; as the court noted, "[i]n a hypothetical negotiation, a patent owner can be expected to account for the profits its affiliates and licensees earn on its patents."  (A101.)

CASE PARTICIPANTS ONLY

generic omeprazole supplier would be likely to alter the dynamic in the prescription PPI market in a way that would damage Astra financially." (A115-16.)  After carefully reviewing the evidence concerning the PPI market in November 2003 and the risks that Astra would have perceived, the court concluded that Astra had "shown through overwhelming evidence that it was in the driver's seat in the negotiations and would have required Apotex to pay a hefty portion of its profits for a license." (A116.)  In seeking a royalty sufficient to "offset lost sales from Prilosec® and the increase in financial support required to keep Nexium®'s market share stable or to improve it," the court found that it "is reasonable to conclude that Astra would not have licensed Apotex for anything less than 50% of Apotex's profits." (A120.)

On Apotex's side of the negotiations, because Apotex "expected to (and did) make substantial profits from its sale of omeprazole," the court concluded that "it would have been willing to pay a large share of those profits for the right to use the patents in 2003." (A103.)  The court found that "Apotex would not have had any confidence that it could create a non-infringing product, much less do so on a timetable that would permit it to become a strong player in the generic PPI market." (A105-06.)  The court found that even "[a]t its most optimistic, Apotex would … have expected a delay of at least two years before it would be able to

begin selling an approved product," which would have cost Apotex 59.2% of its profits during the infringement period. (A110.)

In the end, the court found that Astra had "shown not just by a preponderance of the evidence but convincingly that the hypothetical licensing fee to which Astra and Apotex would have agreed would have been at least 50% of the Apotex gross margin from its sales of omeprazole." (A127.) The court noted that Apotex would still have had "a profit margin of 36%, which is solidly in the range of [the] 31 to 48% margins it typically earned on its products at the time." (A126.)

## SUMMARY OF ARGUMENT

Because it cannot plausibly challenge the district court's factual findings as clearly erroneous, Apotex identifies three supposed legal errors: (1) failure to link the award to the "harm" Astra suffered, which Apotex claims was "negligible" because its generic sales had no "discernable [sic] impact on Prilosec sales" (Apotex Br. 24-25, 31); (2) violation of the entire market value rule by failing to isolate the value of the "patented invention"—which Apotex mischaracterizes as "a subcoating that formed *in situ*"—from that of the entire omeprazole capsule (*id.* at 26-27); and (3) including Apotex's unlawful sales during the pediatric exclusivity period in the award (*id.* at 27). In each case, Apotex's argument rests on a misunderstanding of the law, the facts, or both. The court's decision was well reasoned and legally sound in all respects.

*First*, Apotex misunderstands the role and purpose of reasonable royalty damages, which are "the floor below which damages shall not fall." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Rather than compensate for lost profits, a reasonable royalty compensates the patentee for the licensing revenue it would have received had the infringer taken a license rather than infringe. To determine that reasonable royalty, the proper approach is to "recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Id.* at 1325. The district court's careful analysis of the factors affecting the parties' bargaining positions, including the risks that Astra would have perceived from licensing Apotex and the benefits that Apotex would have perceived from obtaining a license, recreated that scenario, and the court's award reflects the agreement that would have resulted.

*Second*, Apotex's invocation of the entire market value rule and Apotex's focus on the supposed "infringing component (a subcoating that formed *in situ*)" are wrong on several levels. Apotex is mistaken because the patented invention is not the subcoating, but a complete omeprazole formulation of which the subcoating is only one element. The entire omeprazole capsule is the "smallest saleable patent-practicing unit," *LaserDynamics*, 694 F.3d at 67, and it is the product on which a reasonable royalty is properly assessed. Moreover, Apotex's

inability to develop a noninfringing formulation convincingly demonstrates that Apotex is wrong to assert that the patented formulation is of only "minimal" value.

*Finally*, Apotex is mistaken concerning the pediatric exclusivity period. This Court already determined that Astra was entitled to a post-expiration remedy that effectively barred Apotex from selling omeprazole during the pediatric exclusivity period. (*See supra* at 10.) That disposes of Apotex's reliance on *Brulotte* and the supposed improper extension of the patent monopoly. The rest of Apotex's argument rests on misreading section 271 and imagining a November 2003 negotiation that is not merely hypothetical, but irrational, calling for a license under which Astra would have relinquished its statutory right to exclusivity for free. The court's decision that, in November 2003, the parties would have negotiated a license that allowed Apotex to sell during Astra's pediatric exclusivity period, and provided corresponding compensation to Astra, is the only reasonable conclusion.

The judgment should be affirmed in all respects.

## STANDARD OF REVIEW

This Court reviews district court findings concerning the amount of damages, the type of damages, the appropriateness of the damages, and the reasonable royalty rate for clear error. *Home Savings of Am., FSB v. United States*, 399 F.3d 1341, 1346-47 (Fed. Cir. 2005); *SmithKline Diagnostics, Inc. v. Helena*

*Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991).  The Court reviews the district

court's methodology for arriving at a reasonable royalty for abuse of discretion.

*Home Savings*, 399 F.3d at 1346-47; *SmithKline Diagnostics*, 926 F.2d at 1164.

"'A district court abuses its discretion when its decision is based on clearly

erroneous findings of fact, is based on erroneous interpretations of the law, or is

clearly unreasonable, arbitrary or fanciful.'"  *Sanofi-Aventis v. Apotex Inc.*, 659

F.3d 1171, 1177 (Fed. Cir. 2012) (citation omitted).

## ARGUMENT

### I.    The District Court Properly Awarded Astra A Reasonable Royalty Equal To 50% Of Apotex's Profits On Infringing Sales By Applying The *Georgia-Pacific* Hypothetical Negotiation Framework.

The parties agreed that Astra's damages would be measured by a reasonable

royalty on Apotex's infringing sales and that the reasonable royalty would be

determined using the hypothetical negotiation analysis of *Georgia-Pacific Corp. v.*

*United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  Having done

so, Apotex accepted that the reasonable royalty analysis would "necessarily

involve[] an element of approximation and uncertainty.'"  *Lucent,* 580 F.3d at 1325

(quotation omitted). Nevertheless, unhappy with the result this agreed approach

produced, Apotex now argues that the court committed legal error by awarding

Astra "windfall" damages unrelated to any actual injury.  (*E.g.,* Apotex Br. 26.)

Apotex misunderstands the law and mischaracterizes the record.

## A.    Apotex's Arguments Rest on a Fundamental Misunderstanding of Reasonable Royalty Damages.

Upon a finding of infringement, the patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284. There are "[t]wo alternative categories of infringement compensation" available under section 284, "the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining."  *Lucent*, 580 F.3d at 1324.  A reasonable royalty is "the floor below which damages shall not fall."  *Id.*

As was stipulated here (A33439[¶1]), a reasonable royalty may properly be determined by considering a hypothetical negotiation between the patentee and the infringer before the first infringement.  *See Lucent*, 580 F.3d at 1324-25.  When the reasonable royalty approach is used, a patentee need not prove sales or profits lost due to infringement.  To the contrary, the "'statute guarantees patentees a reasonable royalty even when they are unable to prove entitlement to lost profits.'" *Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548, 2012-1549, 2014 WL 1646435, at *31 (Fed. Cir. April 25, 2014) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002)); *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (reasonable royalty proper where "actual damages cannot be ascertained"); *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988) (reasonable royalty is proper where "the

evidence is inadequate to establish actual or nearly actual damages"), *overruled in part on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004); *Georgia-Pacific*, 318 F. Supp. at 1127 ("The statute created the recovery of a reasonable royalty for the very purpose of affording fair compensation in cases such as this, where the victimized patentee is unable to prove that he lost a measurable amount of profits as a result of the infringement.").  Indeed, were the law otherwise, a patentee that did not compete directly with the infringer—and thus did not lose sales to the infringer— would be deprived of any recovery at all, for it would be unable to show the kind of harm that Apotex asserts the law requires.  *See Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1560-61 (Fed. Cir. 1983).

Apotex arrives at its erroneous contrary conclusion by misreading cases such as *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010), and *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).  The concern in *Aro Mfg.* was the double recovery a patentee would receive if paid a royalty by both direct and contributory infringers.  377 U.S. at 502-04, 510-12.  Nothing in *Aro Mfg.* suggests that a reasonable royalty must measure lost sales or profits; to the contrary, the Court explained that the loss the patentee suffered from infringement was the royalty that would have been paid under a license.  *Id.* at 509; *see also General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983) (patentee

should be "placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement"; "damages consist…of the value of the royalty payments" plus loss of use of money). And, by requiring in *ResQNet.com* that "the damages inquiry must concentrate on compensation for the economic harm caused by infringement" and rejecting awards based on "evidence unrelated to the claimed invention," 594 F.3d at 869, this Court was not announcing new requirements for reasonable royalty awards, but reaffirming that the inquiry must focus on "the invention's footprint in the marketplace." *Id.*; *see also Apple*, 2014 WL 1646435, at *28 (damages must be tied to the claimed invention); *LaserDynamics*, 694 F.3d at 76 (purpose of reasonable royalty is "to discern the value of the patented technology to the parties in the marketplace when infringement began").

Contrary to Apotex's assertions (Apotex Br. 25, 29-30), none of this changes the fundamentally compensatory nature of patent damages, for "[t]he fact of infringement establishes the fact of damage because the patentee's right to exclude has been violated." *Apple*, 2014 WL 1646435, at *31 (quotation omitted). Reasonable royalty damages thus place the patentee in the position it would have occupied but for the infringement, *see, e.g.*, *General Motors*, 461 U.S. at 655-56, because the hypothetical negotiation methodology presumes that rather than infringing, the defendant chose to "pay an agreed royalty," *Fromson*, 853 F.2d at

1576.  *See also Apple*, 2014 WL 1646435, at *33 ("'The premise of the reasonable

royalty measure is that a holder of a valid and infringed patent has inherently

suffered legal damage at least to the extent of a lost license royalty opportunity.'")

(quoting Donald S. Chisum, *Chisum on Patents*, § 20.07[3][a] (2011)); *Aro Mfg.*,

377 U.S. at 509.  Rather than attempt to reconstruct the market to determine the

profits the patentee would have made if the infringer had never entered—as

required in lost profits cases like *Grain Processing Corp. v. American Maize-*

*Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999) (Apotex Br. 32, 36)—the

hypothetical negotiation framework "tries, as best as possible, to recreate the *ex*

*ante* licensing negotiation scenario and to describe the resulting agreement."

*Lucent*, 580 F.3d at 1325.  That is precisely what the district court did in this case,

in which Astra sought a reasonable royalty, the parties stipulated to that approach,

and the harm caused by the infringement, although undeniable, could not readily

be isolated from other market factors (*e.g.*, A65, A72-73).

## B.     The District Court Properly Applied the Hypothetical Negotiation Analysis to Determine the Reasonable Royalty in this Case.

To recreate the licensing negotiation scenario that would have prevailed in

November 2003, the district court analyzed the dynamics of the PPI marketplace,

the impact of TPPs, and the motivations and relative bargaining positions of the

parties.  Apotex does not suggest that any of the court's findings were clearly

erroneous.

## 1. The District Court Correctly Found that Astra Would Have Demanded a Substantial Royalty.

The court found that "Astra has shown through overwhelming evidence that it was in the driver's seat in the [hypothetical] negotiations and would have required Apotex to pay a hefty portion of its profits for a license." (A116.)  This finding was neither clearly erroneous nor an abuse of discretion.

### a. Astra Would Have Reasonably Expected that Licensed Apotex Omeprazole Products Would Harm Astra's Substantial Nexium® and Prilosec® Sales and Profits.

Even where a patentee cannot prove the amount of profits it lost due to infringement, the patentee's reasonable expectations concerning the profits jeopardized by the hypothetical license must be considered in setting a reasonable royalty.  *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1379-80 (Fed. Cir. 2010); *Georgia-Pacific*, 318 F. Supp. at 1121, 1127.

As the court found, one of the "primary concerns" that would have shaped "Astra's position in a hypothetical negotiation with Apotex" would have been "ensuring that the license would adequately compensate it for any economic harm it would suffer as a result of Apotex's [licensed] entry into the market." (A116.) That economic harm was the likely impact of Apotex's licensed entry on Astra's Nexium® and Prilosec® sales and profits.  (A116-17.)

Apotex focuses almost exclusively on Prilosec® to argue that Astra would have expected "minimal (if any)" or "negligible" harm and, therefore, would have accepted a nominal royalty. (Apotex Br. 2, 25, 31-35.) By November 2003, Prilosec® sales had fallen from their previous heights due, in large part, to generic competition. Nevertheless, "Astra still earned substantial profits on sales of Prilosec®," and "Prilosec® continued to provide a significant stream of income to Astra." (A9, A40.) Astra believed those sales were "worthy of protection." (A32280-81[224:18-226:21].)

Moreover, Apotex ignores the finding that, as of November 2003, Astra was vitally "concern[ed]" with the growth and success of Nexium®. (A9; *supra* at 11.) By November 2003, Nexium® was a blockbuster drug and its sales and market share were growing rapidly despite generic omeprazole.[8] (*See supra* at 8.)

The court found that the continued growth of Nexium® was due, in part, to a critical fact about the PPI market in 2003: "[F]or many TPPs during the period in which the hypothetical negotiations were occurring, the cost of Nexium® therapy remained quite close to that of treatment with generic omeprazole." (A37; *see also*

---

[8] Apotex does not dispute that the impact on Nexium® was a factor properly considered in the reasonable royalty analysis. *See*, *e.g.*, *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554-55 (Fed. Cir. 1995) (en banc) (court may consider impact of license on patentee's collateral sales); *Georgia-Pacific*, 318 F. Supp. at 1129-30 (same). In any event, having failed to object to the introduction of evidence concerning the impact on Nexium® below, Apotex has waived any such objection. *Lucent*, 580 F.3d at 1325.

Case: 14-1221 Case: 14-1221 Document: 38 Page: 52 Filed: 05/08/2014 Document: 37 Filed: 05/08/2014 Page: 52 Filed: 05/08/2014

CASE PARTICIPANTS ONLY

A30-37.)  *Branded* Nexium® remained price-competitive with *generic* omeprazole

for many TPPs because, as of November 2003, "generic drug prices remained

relatively and uncharacteristically high" because "only one generic drug company

[KUDCo] was operating freely and without the threat of litigation hanging over it."

(A18; *see also* A9, A14-18, A40, A117.)

That Nexium® remained price-competitive with omeprazole for many TPPs

was significant to Astra because it meant that TPPs had not yet acted to restrict the

use of Nexium®.  (*See supra* at 12-14.)  A loss of Nexium®'s net price advantage,

however, would have threatened its favorable position or required Astra to increase

rebates on a substantial portion of its $2.5 billion Nexium® sales.  (*Id.* at 16-17)

The court found that the price of omeprazole fell by 16%—from $3 to

$2.50—in the period following Apotex's actual "at risk" entry, but that "it was not

possible to isolate Apotex's contribution" to that price decline.  (A72-73; *supra* at

15-16.)  However, the court determined that Astra reasonably would have expected

that a *licensed* Apotex entry would cause a more dramatic price reduction.  (A9,

A15-16, A40-41, A52, A115-20.)  This was because "the uncertainty about

infringement that accompanies an at-risk launch makes an at-risk generic drug

manufacturer hesitant to cut prices," while a licensed manufacturer can "engage in

price competition without any constraint imposed by litigation risk."  (A15-16,

A117; *supra* at 16-17.)  The court found that the entry of a fourth generic (and

CASE PARTICIPANTS ONLY
CONFIDENTIAL MATERIAL REDACTED

second unconstrained generic) would likely have a significant price effect. (A118;

*supra* at 15-17.)

Undisputed evidence supports this finding. (A15-16; *supra* at 15-17.)



⁹ (A2498-

99[32:20-34:5]; *see also* A17476[¶45] ("Astra's view [was] that generic

omeprazole manufacturers would not reduce prices significantly if they launched at

risk, but would reduce prices substantially (and drive down overall omeprazole

prices) if they were able to launch not at risk"), A29820 (Astra document stating

"[a]s things are now additional generic entrants will enter fully at risk and therefore

will not compete on price"; if risk removed, "additional generic omeprazole would

enter to compete on price and take generic omeprazole quickly down …"),

A32436[841:19-842:12] (Apotex expert Dr. Schondelmeyer: "[A]n at-risk product

may be priced a little higher than a not-at-risk product because the generic

---

⁹ Apotex thus recognized that infringement damages could represent a substantial
portion, or even more than, its profits on infringing sales. *See, e.g.*, *Golight, Inc. v.
Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338-39 (Fed. Cir. 2004) ("'There is no rule
that a royalty be no higher than the infringer's net profit margin.'") (quoting *State
Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989)).

company realizes that there's some probability of being found at risk rather than not at risk and they factor that into their business decision."); A17472[¶35], A32384[633:12-634:3], A32396[682:1-684:8], A32492[1064:19-25].)

Thus, Astra would have reasonably expected that Apotex's licensed entry "would swiftly accelerate the decline in omeprazole prices and lead to the destruction of the remaining Prilosec® market" and a decrease in Nexium® sales or increase in Nexium® rebates.  (A9, A40-41, A52, A69, A115-20; *supra* at 15-17.)  Astra therefore had a strong economic incentive not to allow such entry in November 2003.  (A9, A52, A69, A115-20.)

> **b.  Apotex's Argument that its Licensed Products Would Not Have Been Expected to Harm Astra Ignores the Reality of the PPI Market in November 2003.**

Apotex asserts that its licensed entry could not have harmed Astra because any harm had already been inflicted by KUDCo's, Mylan's, and Lek's products, as well as Prilosec OTC®.  (Apotex Br. 2, 14-21, 32-35.)  The court found to the contrary, based on a wealth of evidence.

*First*, Apotex's contention that the omeprazole market was "well on its way to full genericization" in November 2003 (Apotex Br. 30) is belied by the facts the court found.  As an initial matter, the court found that a prescription drug market is not considered "genericized" until a maxiumum allowable cost ("MAC") is set by TPPs, and "[t]here was no evidence at trial that a MAC was ever imposed for

omeprazole." (A26-27, A40 & n.23; *see also* A32392[666:3-668:5], A32545[1273:4-1274:18].) Apotex does not challenge these findings.

Moreover, Apotex bases its arguments regarding supposed "genericization" largely on documents prepared between 1998 and 2002 that *predicted* that when multiple generics entered the market, omeprazole prices would fall precipitously, leading TPPs to take negative actions against Prilosec®. (Apotex Br. 11, 19 (citing A4248, A28371-445, A28612-15, A28616-47, A31380, A31389, A31819-21)).) But those predictions turned out to be largely incorrect, and as the court found, by November 2003 Astra knew the reality was very different. (A14-18, A21-22, A30-37, A40, A117; *supra* at 12-14.) Omeprazole prices had not dropped significantly by November 2003, and TPPs had not taken negative actions against Prilosec® and Nexium®. (A14-18, A30-37.)

*Second*, Apotex's assertion that Prilosec OTC® caused a reduction in Prilosec® sales volume (Apotex Br. 17-19, 32-34) is beside the point. The court found that, as expected, Prilosec OTC® quickly took significant sales from Prilosec® and omeprazole. (A23, A52, A69-71, A124-25; *supra* at 17.) But more important to the only relevant question, the court found that Prilosec OTC® did *not* cause a drop in omeprazole *prices*. (A23.) Accordingly, Nexium® remained price competitive to generic omeprazole despite Prilosec OTC®'s entry.

Because the evidence showed—and the court found—that neither the entry of KUDCo, Mylan, and Lek nor the entry of Prilosec OTC® caused a material decrease in omeprazole prices, Apotex's argument that Astra would suffer no harm from Apotex's licensed entry lacks merit.

> ### c.   Apotex's Argument that the Court Improperly Ignored the Impact of Apotex's *Actual* "At Risk" Entry and Only Considered the Impact of Apotex's *Expected* Licensed Entry is Wrong as a Matter of Fact and Law.

Apotex argues that the court erred by ignoring the actual impact of Apotex's "at risk" entry and relying exclusively on the expected impact of Apotex's licensed entry. (Apotex Br. 31, 35-37.) Apotex's argument has no basis in law or fact.

Apotex concedes that "a key issue in this case was the extent to which Apotex's launch in November 2003 … *would have been expected to impact*" Astra. (Apotex Br. 31 (emphasis added).) But Apotex then argues that the court erred in analyzing what "the parties *would have anticipated*" would occur "in a hypothetical world" "that never happened," *i.e.*, "Apotex's entry in the market as a licensed competitor." (*Id.* at 31, 35-36.)

Apotex ignores the fact that it stipulated that the proper measure of damages is a reasonable royalty and that the proper way to determine that royalty is the *Georgia-Pacific* hypothetical negotiation approach, in which the court determines the parties' *ex ante* motivations and expectations as of November 2003. (Apotex

Br. 7-8; A4, A33439-40[¶1].)  *See Lucent*, 580 F.3d at 1324-25 ("The hypothetical

negotiation tries … to recreate the *ex ante* licensing negotiation scenario and to

describe the resulting agreement."); *Riles*, 298 F.3d at 1313 ("A reasonable royalty

determination … must relate to the time infringement occurred, and not be an

after-the-fact assessment."); *Hanson*, 718 F.2d at 1081 (a reasonable royalty "is to

be determined not on the basis of a hindsight evaluation of what actually happened,

but on the basis of what the parties to the hypothetical negotiation would have

considered at the time of the negotiations").

Nor did the court ignore the "book of wisdom"—*i.e.,* evidence concerning

Apotex's actual "at risk" entry.  The court devoted ten pages of its findings to

analyzing the PPI market after Apotex's entry (A64-73), and found that

omeprazole prices decreased and Nexium® rebates increased (A65, A69, A72-73).

Although the court noted that it was "not possible" to isolate Apotex's precise

contribution to this injury, it found that Apotex's products were part of the

competitive landscape that caused it.  (A65, A72-73.)

Moreover, this is not a case in which "book of wisdom" knowledge of what

actually happened after the fact sheds meaningful light on the reasonable royalty

analysis.  It will often be the case that the market impact of a licensed competitor is

the same as that of the unlicensed infringer, and so what actually happened should

parallel what would have happened had a license been negotiated.  This, the district

court found, is not such a case, because of the pricing freedom a *licensed* Apotex would have enjoyed compared to the pricing restraint the actual at-risk Apotex exercised.  (A9, A40-41, A52, A73, A115-20.)  Here, therefore, "experience" was not "available to correct uncertain prophecy," *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933), because the "experience" reflected a situation very different than that encompassed by the hypothetical negotiation.

As the court correctly explained, the relevant question for *this* hypothetical negotiation is the *expected* impact of Apotex's *licensed* entry on omeprazole prices and Nexium® rebates.  (A52, A69, A73, A115-20.)  As to that question, it found that Astra reasonably would have expected Apotex's licensed entry to cause a dramatic decrease in omeprazole prices, which would cost Astra more Prilosec® sales and require Astra to increase rebates on the $2.7 billion of Nexium® it sold in 2004.[10]  (A52, A69, A115-20; *supra* at 16-17.)  Apotex has no response.

### 2.    The District Court Correctly Concluded that Apotex Would Have Been Willing to Pay a Substantial Royalty.

Apotex does not challenge the court's finding that "[b]ecause Apotex expected to (and did) make substantial profits from the sale of omeprazole, it

---

[10] Because Apotex's 2004 sales of generic omeprazole were ██████████ (A16031), it had a comparatively small sales base on which it would have been able to pay a royalty to compensate Astra for the potential harm to Nexium® and Prilosec® sales.

would have been willing to pay a large share of those profits for the right to use the patents in 2003." (A103.) Apotex projected a gross margin of over 92%. (A124-25, A16402-07, A16419, A35957[¶51].) Although Apotex's actual profit margin was lower, it was still 75%, far higher than the 31% to 48% average margins it earned on its products. (A74, A126, A2318[163:3-164:20], A16523, A16592.) Paying 50% of its profits as a royalty would leave Apotex with an anticipated gross margin consistent with the 40% it typically achieved and above its target of 30%. (A123, A2318[163:3-164:20], A2439[64:6-24], A35957[¶51 n.68].) This alone provides ample basis for the award. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899, 902 (Fed. Cir. 1986) (affirming 30% reasonable royalty determined using "analytical approach" in which court "subtracted the infringer's usual or acceptable net profit from its anticipated net profit realized from the sales of infringing devices").

Apotex likewise does not dispute that it would also have expected to increase sales of other products as result of offering omeprazole, which lends further "support for the idea that [it] would have been willing to pay a substantial royalty for the right to sell omeprazole." (A104-05.) *See Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1558-59 (Fed. Cir. 1983) (finding it "eminently reasonable" to "take into account the impact of anticipated collateral sales … on the respective bargaining positions of the parties…").

Nor does Apotex challenge the findings that it did not have a noninfringing formulation in November 2003 (A113) and could have "had no reasonable confidence in the Fall of 2003 that it could find" a noninfringing formulation (A56). Apotex contends, however, that the court placed "undue emphasis" on Astra's ability to keep Apotex off the market by refusing to grant a license (Apotex Br. 30), and "awarded Astra for Apotex's sunk costs and perceived future costs associated with switching formulations" (*Id*. at 39). Neither contention is correct.

The availability of a noninfringing alternative is unquestionably a factor properly considered in determining a reasonable royalty. *See Riles*, 298 F.3d at 1312 ("The economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation."). As Apotex's expert conceded, the higher the cost of pursuing a noninfringing alternative, the more a potential licensee will be willing to pay for a license. (A32485[1036:5-24].) The court thus did not err by considering what it would have cost Apotex to implement a noninfringing alternative.[11] *Cf. Mars, Inc. v. Coin*

---

[11] Apotex's citation (Apotex Br. 40 n.16) to the FTC's report, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* ("*Evolving IP Marketplace*") (2010), is inapposite. In the portion Apotex cites, the FTC recommends—as Apotex argued below (A112)—that the hypothetical negotiation be assumed to occur, not at the time of first infringement, but "at an early stage of product development, when the infringer is making design decisions." *Evolving IP Marketplace* at 191. The law is clear, however, that the hypothetical negotiation is placed at the time of first infringement, *Rite-Hite*, 56 F.3d at 1554, as the parties stipulated (A33439-40[¶1]). The district court correctly rejected Apotex's

*Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008) (rejecting claim that "reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, non-infringing alternative"); *Hanson*, 718 F.2d at 1081-82 (same).

Moreover, the court's analysis did not turn on "switching costs" or "sunk costs." (Apotex Br. 39.) It was based on the fact that Apotex did not have any alternative to which to switch. This reality jeopardized all of the substantial profits that Apotex expected to make between November 2003 and October 2007. (A53, A106-07.) Even "[a]t its most optimistic," Apotex would have expected a delay of "at least two years," which would have risked 59.2% of the profits it expected to earn during the infringement period. (A110, A35973-74[¶81].) There was nothing unreasonable about the court's conclusion that "[t]he likelihood that Apotex would have faced at least a two year delay if it attempted to develop a non-infringing formulation … shed[s] light on the value to Apotex of a license." (A64.) This Court recently endorsed just such an analysis. *See Apple*, 2014 WL 1646435, at *33 (citing expert testimony regarding the time it would take to design around a

---

invitation to depart from settled law and the parties' stipulation. (A112-13.) Moreover, in this case, the FTC's approach would have yielded the same result because the evidence showed that Apotex had "tried mightily" to design around the patents from the earliest stages of its development efforts, but "abandoned" those efforts "as futile." (A62-64.)

patent and the infringer's associated foregone profits in that period as evidence

pertinent to damages).

### C. The District Court Correctly Concluded that Astra's Licenses and Other Agreements Support the Reasonable Royalty Determination.

Apotex's assertion that the court gave "short shrift" to Astra's

"contemporary licensing agreements" with the makers of other branded PPIs and

P&G (Apotex Br. 30-31, 41-46) is meritless.  The court considered each of those

agreements at length (A43-52, A120-22), and while it did not regard any of them

as a "perfect benchmark" for the outcome of a hypothetical negotiation between

Astra and Apotex in November 2003, its conclusions concerning their relevance

(or lack thereof) were well supported.

The court correctly found that Apotex had failed to show that Astra's 1994-

1996 agreements with Takeda, Eisai, and Byk—none of which covered

omeprazole—were relevant benchmarks.  (A122.)  Apotex's expert did not even

bother to address these agreements in his direct testimony.  (A35837-89; *see also*

A32487-88[1045:24-1046:18].)  The court properly credited the unrebutted

testimony of Astra's witnesses showing that because these agreements arose from

disputes in which the counter-party accused Astra of infringement or threatened

Astra's patent portfolio, and because the agreements included other patents and

other features, none of them provides a benchmark for this case.  (A17442-

44[¶¶16-27], A32327-28[408:17-411:24], A35987-88[¶¶105-06].)  Indeed, these are precisely the kind of agreements settling unresolved claims of infringement and invalidity that Apotex argues elsewhere should not be considered.  (Apotex Br. 44-45.)

Nor did the court err in analyzing the 1997 P&G agreement.  Although Apotex no longer argues, as it did below, that the agreement's 7% base royalty should cap the reasonable royalty,[12] it does argue that P&G's payment of a blended royalty of 23% of net sales shows that the royalty the court established is unreasonable.  (Apotex Br. 43-44.)  But, as the court pointed out, Prilosec OTC® and generic omeprazole were expected to have very different impacts on Astra.  When Astra entered the P&G agreement in 1997, it expected that Prilosec OTC®'s impact on its prescription Prilosec® business would be minimal.  (A48-51.)  More importantly, Astra expected that Prilosec OTC®, unlike generic omeprazole, would actually *help* it promote Nexium® and that P&G's promotion of Prilosec OTC® would provide substantial benefits above and beyond royalty payments.

---

[12] Apotex makes a back-door attempt at this argument by citing a document that indicates that *P&G* (not Astra) forecast first year sales of $280 million as of October 2003.  (Apotex Br. 43.)  As the court found, at that time Astra believed sales would be higher (A47), bringing the higher royalty rates into play, and certainly believed sales would be higher when the agreement was signed in 1997.  (A32330[419:20-420:4], A32331[423:15-20].)

(A17445-47[¶¶31-34, 36], A32329[414:18-415:12], A35988-89[¶107]; *supra* at 26-27.)

In contrast, as the court found, Astra would have seen no such upside—and, in fact, substantial risk—to its Nexium® business from licensing Apotex. (A50-52.) Because, "[u]nlike Apotex's omeprazole," Prilosec OTC® was "a product that Astra expected to benefit its product line" (A121), the fact that P&G's effective royalty rate was less than what the court awarded says nothing. As the court held, all one can conclude from the P&G agreement is that "Astra received a handsome royalty for a product that was an essential part of its long term PPI strategy." (A121.)

Finally, Apotex's criticism of the court for considering Astra's settlement negotiations with Andrx and Teva is meritless. Apotex's own expert initially relied on the Teva agreement as a benchmark and only attempted to distinguish it when later faced with data that showed that the settlement amount represented 54% of Teva's net omeprazole profits.[13] In any event, the court appropriately referred

---

[13] Because Apotex's expert initially calculated a royalty based on inaccurate public data, Astra obtained Teva's consent to produce confidential, non-public information concerning sales and profits. (A1090-91.) Until that information was produced—revealing that the royalty inherent in the Teva agreement was much higher—Apotex's expert indicated that he might rely on that agreement. (*Compare* A35842, 44[¶¶11, 14] (referring to Teva settlement in testimony concerning "existing agreements for the use of the patented technology [that] provide useful evidence regarding a reasonable royalty") *with* A31792-94.)

to the Andrx offer and Teva settlement to corroborate that "a 50% licensing fee fits comfortably within the range of negotiations that occurred in connection with the patents-in-suit" and that "generic drug manufacturers are willing indeed to pay fees in the range of 50% of their profits or higher."  (A120-23.)

This analysis was consistent with precedent.  There is no blanket prohibition on considering settlement agreements.  *See ResQNet.com,* 594 F.3d at 872 (observing that "the most reliable license in this record arose out of litigation").  As Apotex itself explains, the concern is with settlements that are (like the Takeda, Eisai, and Byk settlements) "conducted in the midst of litigation, where validity and infringement may be hotly contested, and where 'buying one's peace' can have significant (and potentially enormous) value to the parties." (Apotex Br. 45.) However, the Andx offer was made, and Teva agreement entered, long *after* infringement and validity had been conclusively determined.  (*See supra* at 28.) Thus, the court's limited consideration of Andrx's offer and Teva's agreement was appropriate.  John M. Skenyon *et al.*, *Patent Damages Law and Practice* § 1:15 (2008) ("[L]icenses negotiated to settle a case after a court has established validity and infringement of the patent are very probative of reasonable royalty.  Such licenses duplicate the analytical process undertaken by the court in setting reasonable royalty damages in the 'willing licensor-willing licensee' fictional negotiation.").

55

## II.   The District Court Properly Held That The Royalty Should Be Based On Apotex's Infringing Omeprazole Products, Rather Than A Single Element Of Those Products.

Apotex's contention that the court erred by "failing to isolate the value of the patented invention from the entire marketable capsule" simply ignores the law and what the Patents actually claim.  (Apotex Br. 46-51.)

Apotex errs at the outset by asserting that the "patented invention" (which it also describes as the "patented feature" or "infringing component") is a subcoating, and not an omeprazole product.  (*Id.*)  But the Patent claims are not limited to a subcoating—they are directed to an entire omeprazole formulation, with three distinct elements:  (1) a core region comprising omeprazole and an ARC; (2) a water soluble inert subcoating; and (3) an outer enteric coating.  (A10-11, A4331-32.)  The subcoating is one required element, but it is not the "patented invention." As the Supreme Court has held, "there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention"—the patented invention is defined by the claim as a whole, with all of its limitations.  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345 (1961).  Apotex's attempt to collapse the claimed invention down to one of its limitations is legally wrong.  *See Apple*, 2014 WL 1646435, at *22 (district court erred by "incorrectly focus[ing] on individual claim limitations in isolation," rather than on "the full set of infringed claims.").

Apotex's arguments invoking the "entire market value rule" are thus misplaced. That rule is implicated when the patent relates to a single feature or component of a complex, multi-component product. *See, e.g.*, *Lucent*, 580 F.3d at 1336-40 (rejecting royalty on Microsoft Outlook for patent relating only to "date picking" feature); *LaserDynamics*, 694 F.3d at 66-71 (rejecting attempt to assess royalty on price of laptop computers for patented feature enabling only the detection of different optical discs). The entire market value rule does not apply when the product on which a royalty is sought is the product described by the claim, and thus is itself "the smallest salable patent-practicing unit." *LaserDynamics*, 694 F.3d at 67. Apotex's omeprazole capsules—the product upon which the court assessed the royalty—are the patented product and the "smallest salable patent practicing unit," as Apotex's expert admitted. (A84, A1686-87[92:24-94:21].) The concerns underlying the entire market value rule simply do not apply.

Beyond being legally unsupported, Apotex's attempt to isolate and trivialize the subcoating layer ignores the fact that the subcoating did "substantially create the value" for Apotex's product. (A84 (quotation omitted).) As the district court (and earlier First and Second Wave decisions) found, omeprazole was "notoriously difficult to formulate." (A84-85.) During the ten-year effort to formulate a commercial product, Astra's scientists tried formulations without an inert

subcoating, but they did not work. (A85.) Similarly, Apotex tried to make a formulation without an ARC or an inert subcoating (the microtablet formulation), but failed. (A62-64.) Astra's patented formulation is what enabled Apotex to produce a successful commercial omeprazole product.

## III. The District Court Properly Concluded That The Hypothetical Negotiation Would Have Included The Pediatric Exclusivity Period.

Apotex's argument that the court erred by awarding Astra damages for Apotex's unlawful sales during the pediatric exclusivity period ignores reality and misstates the law.

The reality is this: Apotex was legally barred from selling omeprazole using the patented formulation until October 20, 2007, while Astra had the exclusive right to sell such omeprazole during that period—by virtue of the Patents until April 20, 2007, and by virtue of the FDA's grant of exclusivity for six months thereafter. It is undisputed that Astra was legally entitled to relinquish its right to exclusivity during both of these periods and to be paid for doing so. *See, e.g.*, *Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 2 (D.D.C. 1997) (deferring to FDA interpretation of Hatch-Waxman Act as permitting waivers of exclusivity periods). It is undisputed that, notwithstanding Astra's exclusivity rights, Apotex sold omeprazole using the patented formulation during both of these periods. And, it is undisputed that Apotex did so without Astra's consent and without paying for the privilege.

CASE PARTICIPANTS ONLY

Apotex agreed that the proper damages methodology is to assume a hypothetical negotiation before its unlawful sales began, and it cannot dispute that, without a license from Astra, it was barred from the market until October 20, 2007. Apotex nonetheless imagines a license under which Astra would simply give up six months of exclusivity and permit Apotex to sell without compensating Astra for relinquishing its statutory right to exclude. Apotex does not even attempt to explain why a rational business would have agreed to such an arrangement. Instead, Apotex asserts that the law dictates this result, and forbids any other, based on a misreading of *Brulotte v. Thys*, 379 U.S. 29 (1964), and a convoluted and erroneous interpretation of the relevant statutes. Apotex is wrong as to both.

The concern in *Brulotte* was that a patentee which had a single period of exclusivity—that conferred by its patent—not be permitted effectively to extend that grant beyond the congressionally-conferred term. 379 U.S. at 32-33. This followed from the essential character of the patent bargain—*i.e.*, an inventor receives a limited period of exclusivity in exchange for disclosing his invention to the public so that, upon the expiration of the exclusivity period, the invention is available for free for all to use. As the district court recognized, that has nothing to do with this case, in which the patentee has two congressionally-conferred periods of exclusivity. (A88.) Here, Congress already has determined that the patentee's right to exclude others extends beyond the expiration of the patent, and so the

patentee's decision, in effect, to sell that additional statutory exclusivity raises no concerns about improper extension of a patent or interference with the free market. The market is exactly as Congress intended it to be.

It is also exactly as logic and common sense would dictate. Absent a license, Apotex would have been barred from the market not just for the life of the Patents, but through the pediatric exclusivity period. As the court found, the economic factors that would have made Apotex willing to pay a royalty for the patent term applied equally to the exclusivity period. (A87-90, A35993[¶115].)

██████████████████████████████████████████████

██████████████████████████████████████ (A17118-26, A17150.) It is thus reasonable—indeed, inescapable—to conclude, as the court did, that Apotex would have been willing to pay for the advantage of being able to enter the market before the end of the pediatric exclusivity period, and that Astra would have required such payment.

Apotex's assertion that patent damages law forecloses this indisputably rational expectation is misguided. Apotex asserts that because a patent cannot be infringed after it expires, "any remedies that flow from patent infringement cannot extend past the patent's expiration." (Apotex Br. 53.) But that is a conclusion, not a rationale. Indeed, Apotex concedes, grudgingly, that numerous cases have recognized that damages can be awarded for an infringer's post-expiration sales

where there is "accelerated market entry," *i.e.*, where the infringer would not have made those sales absent its pre-expiration infringement. *See, e.g., Amsted Indus. Inc. v. Nat'l Castings, Inc.*, No. 88-cv-924, 1990 WL 106548, at *18-20 (N.D. Ill. July 11, 1990) (permitting pursuit of damages from post-expiration sales based on "accelerated market entry"); *Merck & Co. v. Mediplan Health Consulting, Inc.*, No. 05-Civ-3650(DC), 696(DC), 698(DC), 699(DC), 700(DC), 701(DC), 2006 WL 1676229, at *7 (S.D.N.Y. June 14, 2006) (same). *Accord Grain Processing*, 185 F.3d at 1350 (recognizing that patentees have "significant latitude to prove and recover" damages for a wide variety of foreseeable economic effects of infringement, including "accelerated market reentry").

Apotex asserts that recovery of post-expiration damages is limited to lost profits cases (Apotex Br. 53 n.20), but it offers no reason why, other than pointing to selected dictionary definitions of "royalty." (Apotex Br. 54.) Apotex ignores the fact that the "royalty" remedy of section 284 is the minimum below which damages must not fall, *e.g., Lucent*, 580 F.3d at 1324, and that courts can award more if necessary to compensate the patentee for the "use made of the invention by the infringer," *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109-1110 (Fed. Cir. 1996); *Stickle*, 716 F.2d at 1563.

Moreover, it is well established that a party in Apotex's position can be expected to consider "all advantages which might accrue to it in determining a

royalty which it would be willing to pay." *Georgia-Pacific*, 318 F. Supp. at 1132.

The "advantages" may include, for example, the enhanced ability to sell non-

patented products. *Id.*; *Deere & Co.*, 710 F.2d at 1558-59. And they may include

advantages accruing after the patents expire. *Georgia-Pacific*, 318 F. Supp. at

1126 (noting the "practical business consideration[]" that "the opportunity to

engage in the sale of a patented product even several years before the patent's

expiration would constitute a definite advantage to [the defendant] who intended to

market the product after the expiration of the patent"). Thus, as in the lost profits

context, it is appropriate for a reasonable royalty award to reflect the post-

expiration benefits an infringer would have received by obtaining a license.

Apotex's reliance on a parsing of 35 U.S.C. § 271(e)(4) is misguided.

Apotex contends that the fact that section 271(e)(4)(C), which authorizes damages

for the commercial manufacture, importation, or sale of an infringing ANDA

product, does not expressly provide for post-expiration relief, while section

271(e)(4)(A), which relates to the revocation of ANDA approval upon a finding of

infringement, does, "strongly suggests" that post-expiration monetary relief is

impermissible. (Apotex Br. 57.) But section 271(e)(4)(A) created a remedy—

enjoining FDA approval—that had not previously existed and that necessarily

requires a temporal limitation. By contrast, section 271(e)(4)(C) invokes one of

the "typical remedies for infringement," *i.e.,* damages, which is already well-

defined by statute and case law.  (A2412.)  Section 271(e)(4)(C) does not add any limitations to the damages otherwise available for infringement, but defines the kind of infringement for which they can be awarded, a definition required by the fact that ANDA cases involve a form of infringement—the filing of an ANDA— that does not actually invade the patentee's right of exclusivity or otherwise cause any harm.  Had Congress intended to limit the damages authorized by section 271(e)(4)(C) beyond that, *e.g.*, by excluding post-expiration damages, it would have done so.  It did not.  *See General Motors*, 461 U.S. at 653 ("When Congress wished to limit an element of recovery in a patent infringement action, it said so explicitly.").

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's

judgment.

Dated:  May 8, 2014                    Respectfully submitted,

                                       /s/ Constantine L. Trela, Jr.
                                       Constantine L. Trela, Jr.
                                       John W. Treece
                                       David C. Giardina
                                       SIDLEY AUSTIN LLP
                                       One South Dearborn Street
                                       Chicago, IL 60603
                                       (312) 853-7000

                                       Paul J. Zegger
                                       SIDLEY AUSTIN LLP
                                       1501 K Street, N.W.
                                       Washington, D.C. 20005
                                       (202) 736-8000

                                       Joshua E. Anderson
                                       SIDLEY AUSTIN LLP
                                       555 W 5th St., Suite #4000
                                       Los Angeles, CA 90013
                                       (213) 896-6000

                                       *Counsel for Plaintiffs-Appellees*
                                       *AstraZeneca AB, Aktiebolaget Hässle,*
                                       *KBI-E Inc., KBI Inc., and AstraZeneca LP*

# CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2014, I caused a true and correct copy of the

BRIEF OF PLAINTIFFS-APPELLEES ASTRAZENECA AB, AKTIEBOLAGET

HÄSSLE, KBI-E INC., KBI INC., AND ASTRAZENECA LP (confidential and

non-confidential versions) to be electronically filed with the Clerk of Court using

the CM/ECF system, which will serve notice of such filing to all registered

CM/ECF users, including any of the following:

Robert Breisblatt (principal counsel)
Brian J. Sodikoff
Stephen P. Benson
Dennis C. Lee
**KATTEN MUCHIN ROSENMAN LLP**
525 West Monroe Street
Chicago, IL 60661-3693
(312) 902-5200
robert.breisblatt@kattenlaw.com
brian.sodikoff@kattenlaw.com
stephen.benson@kattenlaw.com
dennis.lee@kattenlaw.com

Howard Robert Rubin
Robert Thomas Smith
Christopher Jackson
**KATTEN MUCHIN ROSENMAN LLP**
2900 K Street, NW
Suite 200
Washington, DC 20007
(202) 625-3500
howard.rubin@kattenlaw.com
robert.smith1@kattenlaw.com
christopher.jackson@kattenlaw.com

*Counsel for Defendants-Appellants*

Confidential copies will be emailed to the above counsel and two paper copies will

be mailed to the principal counsel noted above.

/s/ Constantine L. Trela, Jr.
Constantine L. Trela, Jr.

*Counsel for Plaintiffs-Appellees*
*AstraZeneca AB, Aktiebolaget Hässle,*
*KBI-E Inc., KBI Inc., and AstraZeneca LP*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rule of this Court, because it contains 13,963 words (as determined by the Microsoft Word 2007 word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing system in 14-point Times New Roman font.

  /s/ Constantine L. Trela, Jr.
Constantine L. Trela, Jr.

*Counsel for Plaintiffs-Appellees*
*AstraZeneca AB, Aktiebolaget Hässle,*
*KBI-E Inc., KBI Inc., and AstraZeneca LP*